IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

COLLEEN WIRFS,                          )
                                        )
                    Plaintiff,          )               CV-07-6018-KI
                                        )
          v.                            )           OPINION AND ORDER
                                        )
MICHAEL J. ASTRUE, Commissioner of Social )
Security,                               )
                                        )
          _____Defendant._____ )


KING, District Judge:

## **<u>INTRODUCTION</u>**

Plaintiff Colleen Wirfs brings this action for judicial review of a final decision of the

Commissioner of Social Security denying her application for disability insurance benefits (DIB)

under Title II of the Social Security Act.  This court has jurisdiction under 42 U.S.C. § 405(g).  The

Commissioner's decision is reversed and remanded for an award of benefits.

## BACKGROUND

Wirfs was fifty-five years old at the time of hearing.  Tr.  74, 607.[1]  She completed high school, one year of college, and beauty school.  Tr.  93.  Wirfs worked as a hairstylist and had her own beauty salon business.  Tr.  87, 100.  She also worked for a short period as a house cleaner and an in-home aid.  Tr.  100.  Wirfs alleges onset of disability from September, 1, 2000, due to bipolar disorder, post traumatic stress disorder (PTSD), obesity, and tricholtillomania.  She filed for disability on January 31, 2001, and her application was denied initially and on reconsideration.  A hearing was held before an Administrative Law Judge (ALJ) on July 17, 2003.  Wirfs satisfied the insured status requirements for a claim under Title II through December 31, 2005.  Tr.  337.  Wirfs must establish that she was disabled on or before that date to prevail on her DIB claim.  42 U.S.C. § 423(a)(1)(A); *Tidwell v. Apfel,* 161 F.3d 599, 601 (9th Cir. 1998).

The ALJ issued an opinion on September 25, 2003, finding Wirfs was not disabled.  Wirfs filed a Request for Review by the Appeals Council.  She also filed another application for benefits on August 11, 2003.  The Appeals Council vacated the hearing decision on October 3, 2003, and remanded the case back to the ALJ with specific instructions.  Another administrative hearing was held on May 10, 2005.  The ALJ issued an opinion on September 22, 2005, finding Wirfs not disabled.  The ALJ's decision is the final decision of the Commissioner.

## DISABILITY ANALYSIS

The initial burden of proof rests upon the claimant to establish disability.  *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995).  To meet this burden, a claimant must demonstrate an "inability to

---

[1]  Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed with the Commissioner's Answer.

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. § 423(d)(1)(A).

The Commissioner has established a sequential process of up to five steps for determining whether a person over the age of 18 is disabled within the meaning of the Act. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987), 20 C.F.R. § 404.1520. At step one, the ALJ determines if the claimant is performing substantial gainful activity. If she is, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4). At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the twelve month duration requirement. 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii). If the claimant does not have such a severe impairment, she is not disabled. *Id.* At step three, the ALJ determines whether a severe impairment meets or equals a "listed" impairment found in the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's severe impairment meets or equals a listed impairment and meets the duration requirement, she is disabled. 20 C.F.R. § 404.1520(d).

If the adjudication proceeds beyond step three, the Commissioner must assess the claimant's residual functional capacity (RFC). The claimant's RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by her impairments. 20 C.F.R. §§ 404.1520(e), 404.1545; Social Security Ruling (SSR) 96-8p. At step four, the Commissioner must determine whether the claimant retains the RFC to perform work she has done in the past. If the ALJ determines that she retains the ability to perform her past work, the Commissioner will find the claimant not disabled. 20 C.F.R. § 404.1520(f).

At step five, the Commissioner must determine whether the claimant can perform work that exists in the national economy. *Bowen v. Yuckert*, 482 U.S. at 142; 20 C.F.R. § 404.1520(e), (g). Here the burden of production shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant can do. *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999), 20 C.F.R. § 404.1566. If the Commissioner meets this burden, then the claimant is not disabled. 20 C.F.R. § 404.1520(g).

## THE ALJ's FINDINGS

The ALJ found at step one of the disability analysis that Wirfs did not engage in substantial gainful work (SGA) since her alleged onset date. Tr. 21. At step two, the ALJ found the medical evidence established Wirfs has severe impairments of moderate obesity, anxiety, PTSD, tricholtillomania, and bipolar disorder. Tr. 21-22. At step three, the ALJ found Wirfs' combination of impairments did not meet or medically equal an impairment listed in 20 C.F.R. Pt. 404, subpt. P, app. 1. Tr. 22.

The ALJ determined Wirfs' RFC was at a medium level of physical exertion with additional restrictions. Tr. 25. The ALJ found Wirfs' mental impairments limited her to work that involves short and simple instructions at an "unrushed" pace. The ALJ also determined Wirfs should not have close interaction with the general public or be involved in team work. *Id.*

The ALJ elicited testimony from an impartial vocational expert (VE). Tr. 607-610. The VE testified Wirfs could not perform her past relevant work. Tr. 608. The ALJ adopted this opinion. Tr. 28. The ALJ asked the VE whether an individual of Wirfs' age, education, experience, and RFC could perform work that exists in significant numbers in the national economy. The VE responded the individual could perform work as a cleaner, motel cleaner, and laundry sorter. Tr. 609. The ALJ

determined Wirfs was able to perform work that exists in significant numbers in the national economy and was not disabled within the meaning of the Social Security Act.  Tr.  29.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); *Batson v. Commissioner of Social Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Morgan v. Commissioner of Social Sec. Admin.,* 169 F.3d 595, 599 (9th Cir. 1999).

The ALJ is responsible for resolving conflicts in the medical evidence and determining credibility.  *Edlund v. Massanari,* 253 F.3d 1152, 1156 (9th Cir. 2001).  The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986).  If the evidence can reasonably support either affirming or reversing the Commissioner's conclusion, the court may not substitute its judgment for that of the Commissioner.  *Thomas v. Barnhart,* 278 F.3d 947, 954 (9th Cir. 2002).

## DISCUSSION

Wirfs alleges the ALJ erred in rejecting the opinions of her treating psychiatrist, Dr. Martin, and treating psychologist, Dr. Hale.  She also contends the ALJ failed to consider lay witness testimony.  Wirfs further alleges the ALJ improperly rejected her credibility.  She further contends the ALJ's conduct at the hearing affected the impartiality of the Medical Expert (ME).

Wirfs also complains the Commissioner's brief is a half of a page too long, in violation of U.S. Dist. Ct. Rules D. OR., Civil, LR 7.1(c).  The court points out LR 1.4, which states a judge has

the authority to suspend or modify the application of the rules in the interest of justice. The court

has determined to accept the last half page of the Commissioner's brief.

## I.    Medical Background

Wirfs has a long history of depression and periods of anxiety, and in 1999 was prescribed

various anti-depressant medications to control her symptoms. Tr. 176-178, 181. Dr. Picone, her

physician, diagnosed an anxiety/mood disorder, probable PTSD, tricholtillomania[2], and noted

"cannot rule out bipolar disorder." Tr. 178. Dr. Witt, Wirfs' psychologist, noted Wirfs minimized

her symptoms, was a compulsive spender, and had a history of manic behavior at work. Tr. 149.

In November 1999, Dr. Witt  noted Wirfs was working fewer hours at her salon in order to reduce

her stress. Dr. Witt suggested other strategies, such as limiting days worked and limiting work with

difficult clients. Tr. 148. Dr. Witt noted in February 2000, that Wirfs was having "flashbacks of

being molested" at age eight or nine,  was pulling out her eyelashes and eyebrows, having memory

problems, but controlling her  spending sprees. Tr. 147. In April 2000, Dr. Witt noted Wirfs was

doing better and no longer feeling suicidal. *Id.*

Dr. Bleman, of Del Norte County Community Mental Health Services, provided medication

support for Wirfs. He noted in May 2000, that her speech was tangential, her affect unusual, her

sleep poor, and she was pulling out her eyelashes. Tr. 157. In July 2000, Dr. Bleman noted Wirfs

was taking Klonopam , Luvox, and Depakote, and had stopped her eyelash pulling, although she had

---

[2]  Tricholtillomania is pulling out one's own hair, with common sites being the scalp,
eyebrows and eyelashes.  Hair loss is noticeable, and there is associated tension followed by
release with the hair pulling.  The disturbance causes clinically significant distress or impairment
in social, occupational, or other important areas of functioning.  The American Psychiatric
Association, *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV), 674-677 (4th ed.
2000).

6 - OPINION AND ORDER

mild over sedation.  Tr.  154.  He noted she was forgetful and scattered, but her mood more stable. *Id.*

Wirfs closed her salon by September 2000.  Tr.  100.  She attempted to work as an in-home care provider from September to November, 2000.  *Id.*  Beverly Schilling knew Wirfs for six years and hired Wirfs to be her care provider.  Tr.  334.  However, Mrs.  Schilling found that Wirfs could not complete simple jobs like washing dishes, would forget what she was doing, and go home.  *Id.*

Dr.  Witt referred Wirfs to Dr.  Martin, a psychiatrist.  Dr.  Martin began treating Wirfs in January 2001, and continued to treat Wirfs until November 19, 2001, for a total of ten office visits.  Tr.  279-280.  In a letter dated March 15, 2001, Dr.  Martin noted he had seen Wirfs twice and was continuing treatment.  Tr.  212.  He further noted, "she would have difficulties in such mental activities of understanding and memory; sustained concentration and persistence; social interaction and adaptability."  *Id.*  In a letter to the state agency, dated May 27, 2003, he stated, "at the time I saw her, in my opinion, it would have been difficult for her to handle the work-related mental activities you asked me about.  This would include understanding, memory, sustained concentration, social interaction, and adaptability."  Tr.  279-280.

The state agency examiner, Dr.  Wahl, conducted an evaluation of Wirfs on May 18, 2001.  Tr.  216-219.  Dr.  Wahl diagnosed bipolar disorder[3], recurrent, moderate, and tricholtillomania, and assigned a Global Assessment of Function (GAF) of 55.[4]  Tr.  218-219.  He noted her mood swings

---

[3]  Bipolar Disorders are characterized by episodes of major depression and at least one manic, hypomanic, or mixed episode.  The American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV), 382-401 (4th ed. 2000).

[4]  The GAF is a scale from 1-100, in ten point increments, that is used by clinicians to determine the individual's overall functioning.  A GAF of 41 to 50 indicates serious symptoms (suicidal ideation, severe obsessional rituals frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job).  A GAF of

were improved with medication and therapy but left her exhausted and uncomfortable around people.
Tr. 219. Dr. Wahl noted her mental status exam suggested some significant limitations in
intermediate memory and concentration, but that she retained the ability to understand and carry out
short and simple instructions. He further noted she would not do well in jobs requiring public
contact or many co-workers, and she was unable to respond appropriately to tactful criticism. Dr.
Wahl noted her daily activities were moderately constrained and that Wirfs should continue therapy.
*Id.*

Dr. Witt noted in May 2001, that Wirfs was having difficulty finishing tasks, did not feel like
doing anything and was unsure if it was depression or anxiety. Tr. 248. Dr. Witt noted Wirfs
closed her salon due to stress and was unable to handle the stress of assisting a disabled woman. *Id.*
In June 2001, Dr. Witt noted Wirfs was highly anxious and had difficulty concentrating on therapy
interactions. Tr. 247.

Dr. McDonald, staff psychiatrist at Curry County Mental Health Services, took over Dr.
Martin's patients and examined Wirfs on January 11, 2002. Tr. 269-273. She diagnosed PTSD,
tricholtillomania, rule out bipolar disorder, and learning disabilities. Tr. 272. Dr. McDonald
assigned a GAF of 60 and recommended some changes in medication to decrease Wirfs' nightmare
activities. *Id.* In February 2002, Dr. McDonald diagnosed PTSD, bipolar II disorder, rule out
bipolar I, and tricholtillomania. Tr. 267. She noted recent episodes of hypomania, recurrent
symptoms of PTSD, mildly anxious affect, and normal speech. *Id.* Dr. McDonald continued

---

51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic
attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends,
conflicts with peers or co-workers). The American Psychiatric Association, *Diagnostic and
Statistical Manual of Mental Disorders* (DSM-IV), 34 (4th ed. 2000)..

treatment of Wirfs through 2002. She noted episodes of seeming improvement and episodes of increased depression and anxiety. Tr. 257-258, 261, 264.

Wirfs called Dr. McDonald's office on July 24, 2002 because she was "not thinking right" and her family noticed she asked the same questions over and over and could not remember the answers. Tr. 261. She reported her family would not let her drive due to her memory problems and she was taking more anti-anxiety medications due to shaking. *Id.* Dr. McDonald continued to treat Wirfs and changed her diagnosis to bipolar I disorder, changed her medications, and recommended keeping a mood diary and returning to therapy. Tr. 258, 264, 266.

Dr. McDonald referred Wirfs to Dr. Hale, a psychologist, who began treating Wirfs in December 2002. Tr. 275-277. Dr. Hale diagnosed bipolar I disorder, most recent episode depressed, moderate, tricholtillomania and assigned a GAF of 41-50. Tr. 217. She noted Wirfs presented with anxiety, depression, impulse control disorder, childhood trauma and family conflicts. *Id.* Dr. Hale also noted Wirfs' history of sexual abuse, eyelash pulling, and found her very nervous, giving tangential answers to questions. Tr. 325. Although Dr. Hale would continue to treat Wirfs at least into 2006, Wirfs would discontinue therapy at various times due to financial reasons. Tr. 324.

Sara Mitchell, a mental health nurse practitioner (PMHNP), began medication management of Wirfs in January 2003. Tr. 254. She noted Wirfs reported her mood was more stable and some of her anxiety symptoms were decreasing due to her therapy with Dr. Hale. *Id.* PMHNP Mitchell also noted Wirfs was scattered, distractable, and confused about her medications, which suggested a period of hypomania. *Id.* Dr. Hale's therapy notes between January and March 2003, note Wirfs' anxiety, that her more self confident behavior is a sign of an onset of a manic phase, and that when

she disassociates she is likely to pull out her hair and overeat.  Tr.  326-327.  Dr.  Hale also noted

Wirfs was having nightmares, but her speech and mood improved by March 2003.  *Id.*

Dr.  Hale noted a decrease in Wirfs' anxiety level between December 2002, and March 25,

2003.  Tr.  276.  She also noted Wirfs' thought form and content became more logical and organized

and Wirfs made progress in medication management.  Tr.  275-277, 431.  PMHNP Mitchell noted

in April 2003, that Wirfs was eating instead of pulling out her hair, her mood was depressed, but

level, and although Wirfs' speech and thoughts were scattered, there was some improvement from

January.  Tr.  251.

Dr.  Hale completed a psychiatric review technique (PRT) form sent by Wirfs attorney in

June 2003.   Tr.  281-294.  She noted Wirfs had marked limitations in activities of daily living,

maintaining social functioning, and maintaining concentration, persistence, and pace.  Tr.  291.  Dr.

Hale also noted Wirfs experienced repeated episodes of decompensation.  *Id.*  Dr.  Hale sent a letter

to Wirfs attorney on July 24, 2003, clarifying her opinion on the PRT form.  Tr.  323-324.  Dr.  Hale

stated she checked marked limitations for activities of daily living because of Wirfs' severe anxiety

in public situations such as shopping, going to the post office or using the telephone.   She noted

Wirfs' anxiety leads to difficulty in maintaining concentration and communicating with others.  Dr.

Hale noted these anxiety episodes made Wirfs too fatigued to keep up with household chores.  Tr.

323.

Dr.  Hale further noted that she checked marked limitations in social functioning because

Wirfs became anxious with other people, which led to stuttering and tangential conversations.  She

also noted that Wirfs had withdrawn from social interaction to a large extent, even leaving her

husband to deal with conflicts in the family.  *Id.*  Dr.  Hale stated she checked marked limitations

for concentration, persistence and pace because Wirfs was easily distracted and could not remember what she read.  Dr.  Hale noted Wirfs had difficulty staying in a fifty-five minute therapy session "because she would become too fatigued from the effort of concentrating on what we were discussing." *Id.*  Dr. Hale also noted Wirfs closed her salon due to the stress and fatigue and noted, "When I first met her, she was cutting hair for a few special friends.  She found that she was too fatigued to do that.  Dealing with friends caused so much anxiety she could not continue to do this for them." *Id*.

Dr.  Hale stated she noted three episodes of decompensation because "Ms. Wirfs tried to continue working in various ways.  She feels the need to assist with family resources intensely.  Each time she tried to find a way to continue working, even on a very limited basis, her anxiety level interfered and she had to give up." *Id.*  Dr.  Hale noted that she had not seen Wirfs since March 25, 2003, and that her ratings were based on her treatment up to that time.  She noted further that Wirfs stopped treatment because of anxiety over finances and that there was a balance due.  Tr.  324.

In July 2003, PMHNP Mitchell noted increasing one of Wirfs' medications caused increased anxiety, jitteriness and loss of hair.  Tr.  437.  She also noted Wirfs experienced more anxiety in anticipation of appointments and would have to "rest up" for two days, and then recuperate two days. *Id.*  PMHNP Mitchell also noted during these cycles Wirfs sleep was poor, she overate, pulled out her eyelashes and eyebrows and had increased anxiety and rumination. *Id.*  She noted Wirfs thought processes were scattered, which seemed baseline, and noted problems with discractability and impaired concentration.  Tr.  436-437.  PMHNP Mitchell discussed a trial of Lithium and  Luvox and possibly other anti-depressants. *Id.*  PMHNP Mitchell continued monitoring Wirfs' medication management through 2003.  Tr.  451.  Her clinical notes indicated periods of stable moods and

periods of depression and hypomania.  Tr.  433, 435, 452.  She started Wirfs on a trial of Lithium in August 2003 and noted some improvement by October 2003.  Tr.  435, 453.

Dr.  Hale resumed treatment of Wirfs on October 20, 2003.  Tr.  466-467.  Dr.  Hale noted Wirfs was having flashbacks regarding her childhood sexual abuse which was causing intense distress.  *Id.*  She noted the Lithium treatment seemed to be helping with Wirfs' depression.  Dr.  Hale noted Wirfs' mood was anxious, her speech slow, she had tremors, and was nervous and shaking during most of her therapy.  *Id.*  In November 2003, Dr.  Hale noted Wirfs was having trouble communicating, was stuttering and having trouble finding appropriate words.  Tr.  466.  She noted Wirfs was shaking when discussing certain issues in therapy and when at a store or around people.  *Id.*  Dr.  Hale continued treating Wirfs into 2006, albeit with some interruptions in therapy. Tr.  460-467, 534-536.  Dr.  Hale noted periods of improvement and periods of increased symptoms of anxiety and depression, including a period in 2005 when she pulled out most of her accessible hair.  *Id.*

PMHNP Sarah Williams began medication management of Wirfs in March 2004.  Tr.  449. She noted Wirfs had stopped Lithium due to side effects.  PMHNP Williams noted Wirfs was benefitting from her work with Dr.  Hale, was better able to handle her moods and appeared stable on her current medications of Depakote and Wellbutrin.  Tr.  449-450.  In April 2004, PMHNP Williams noted although Wirfs was doing well on her current medications, Wirfs experienced increased anxiety secondary to issues in therapy regarding her sexual abuse.  She noted Wirfs experienced flashbacks, intrusive thoughts, increased hair pulling, sleep disturbance and nightmares. However, Wirfs' affect and speech appeared normal, and  PMHNP Williams prescribed Seroquel for Wirfs' sleep problems.  Tr.  448.  PMHNP Williams continued medication management for Wirfs

through July 2006.  Tr.  541-542.  She increased Wirfs medications during her periods of anxiety related to PTSD therapy and noted more stable moods and overall improvement by November 2004. Tr.  442-444.  PMHNP Williams noted some improvement during 2005 and 2006, with periods of increased depression and anxiety, but no suicidal ideation.  Tr.  541-551.

On August 8, 2006 Wirfs attorney sent an undated letter from Dr. Hale to the Appeals Council.  Tr.  557-558.  Dr.  Hale stated since April 16, 2005, she had treated Wirfs approximately twice a month and that finances prevented Wirfs was attending more therapy.  Tr.  558.  Dr. Hale stated Wirfs continued to deal with flashbacks of abuse which made her unable to leave house for several days, becoming very nervous and shaking in public.  *Id.*  She noted Wirfs was unable to completely stop pulling out her eyelashes and eyebrows.  Dr.  Hale diagnosed bipolar disorder, PTSD, social phobia and tricholtillomania.  *Id.*  Although Wirfs was making some progress, Dr. Hale noted,

> [T]he level of anxiety she experiences around others and her assumptions that others are thinking critical thoughts about her make it unlikely that she could be gainfully employed in the foreseeable future.  Her anxiety and trembling would interfere with her ability to concentrate and maintain the pace necessary in employment settings. She would have difficulty interacting with others in the workplace because of assumption that everyone in thinking negative things about her.  These thoughts would cause enough distraction to interfere with her ability to speak cogently and understand what is being said to her.  Her ability to communicate is often affected even in social situations.  It is highly likely that these symptoms will persist for more than two years.

*Id.*

## II.    ME Testimony

Wirfs argues that the conduct of the ALJ at the hearing had an impact on the testimony of the ME.  At the beginning of the hearing, with the ME on the telephone, the ALJ critiqued the opinion of the treating psychologist, Dr.  Hale.  However, as Wirfs notes, the ALJ told the ME, "what you

just heard was my reading, that it should not necessarily be considered as, as (sic) evidence.  So you

may, you may (sic) with freedom agree or disagree with me and I will consider your, your (sic)

comments most carefully."  Tr.  589-590.  Wirfs argues the ME's "impartiality was irreparably

tarnished" by this exchange.  Pl.'s Op. Br. 23.  However, as the record indicates, the ALJ made it

clear to the ME that she was expressing her opinion regarding portions of the record.  There is no

indication from the record that the ME was influenced in any way by this exchange.

Wirfs also argues that the ME testified that her medical condition met a listing, and the ALJ's

challenge of that caused the ME to change his mind.  *Id.*  The ALJ questioned the ME,

ALJ:   Did you feel that there was any 12 month period, particularly when she
       was working through the PTSD, when this individual would have met any
       of the listings?

ME:    Yeah.  I do think so.  I believe that during that period, I, I, I can't say
       exactly how many months, but I - it makes a great deal of sense to me to
       think of it that way.  In my experience, it's been approximately a year-and-
       a-half, sometimes as much as two years in which there is a more acute
       phase of the problem.  And its intragenic, it's been brought about by the
       therapy.  And it's a necessary part of the therapy, because the therapy for
       PTSD is usually three years or more.  And one has to go through this
       phase.

ALJ:   Okay, But did you see a 12 month period when she was doing that and it
       was limiting.  I mean, you can have PTSD.  But. . .

ME:    That's right.

ALJ:   I'm still looking at all those doctor's notes.  And I'm not seeing limitations.

ME:    Well, you can have PTSD and still work, if that's the question?

ALJ:   No, that's what I was asking.  You, you thought she met the listing for a 12
       month period.

ME:    Right.

ALJ:   And that's what I couldn't see, is what was the basis.  I could see that she
       was dealing with her PTSD in a difficult period.  But how did it equate in
       terms of her functioning?  And that's what I could never find was a 12
       month period, when Dr. Hale's notes indicated a nonfunctional person?

ME:    Uh-huh.  I see.

ALJ:   Did you see that?  And if so, what would be the dates?

ME:    I, I have no idea.  Quite honestly, I don't.  You know, I would, I would
       have to really study the progress notes all over again.  And I, I don't see it
       stated in, in so many words.

ALJ:    But you thought she met the listing.  So now I'm trying pin down what that
        period was.  It was your. . .
ME:     Sure you are.  I know your are.  And . . .
ALJ:    Yeah.  It was your statement.
ME:     I said it, I said it made sense to me that it would occur.  But that's . . .
ALJ:    Oh.
ME:     That's because of you know, my variance with this kind of problem.  And
        it is not necessarily reflected in this record.
ALJ:    Ok.

Tr.  599-601.  Although the ALJ pressed the ME for dates, the court does not find the ALJ

engaged in undue pressure.

**III.    RFC**

Wirfs argues the ALJ improperly rejected the opinion of her treating psychiatrist,

Dr.  Martin, and her treating psychologist, Dr.  Hale.  She also argues the ALJ rejected the lay

witness testimony, and her testimony.

**A.  Dr. Martin's Opinion**

Wirfs argues the ALJ improperly rejected the opinion of her psychiatrist, Dr. Martin.  The

ALJ cited Dr.  Martin's letter of March 15, 2001.  Dr.  Martin stated at that time he had treated

Wirfs twice and he noted her mental functional limitations.  Tr.  25.  The ALJ noted, with only

two visits, there was "no evidence to provide a longitudinal analysis of the claimant's mental

impairments and their effect on her ability to function.  Also, the claimant's RFC does provide

limitations reflecting difficulties in these areas."  *Id.*  However, Dr.  Martin responded to a request

by the state agency with a letter dated May 27, 2003.  Tr.  279-280.  Dr.  Martin stated he treated

Wirfs for a total of ten times, from January to November, 2001.  He stated during the time he

treated her it would be very difficult for her to handle the work-related mental activities the

agency described, including, understanding, memory, sustained concentration, social interaction, and adaptability. *Id.*

Social security  regulations specify that the most weight is given to the opinions of treating physicians, followed by examining physicians, and the least amount of weight is given to nonexamining experts. *Holohan v. Massanari*, 246 F.3d 1195, 1201-1202 (9th Cir. 2001).  The ALJ can reject the opinion of a treating physician that is inconsistent with the opinions of other treating or examining physicians, if the ALJ makes findings setting forth "specific and legitimate reasons" based on substantial evidence in the record.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  An uncontradicted opinion of a treating physician may only be rejected for clear and convincing reasons.  *Thomas v. Barnhart,* 278 F.3d 947, 957 (9th Cir. 2002).  However, the ALJ is not required to accept any physician's opinion that is "brief, conclusory, and inadequately supported by clinical findings."  *Id.* at 957.  In addition, the regulations give more weight to opinions of specialists regarding the area of their expertise.  *Holohan v. Massanari*, 246 F.3d at1202; 20 C.F.R.  § 404.1527 (d)(5).

Dr.  Martin is a psychiatrist who treated Wirfs for almost a year for her mental impairments.  The ALJ's rationale to disregard Dr.  Martin's opinion because he only treated Wirfs twice is contrary to the record.  Dr.  Martin's opinion letter of May 27, 2003, stating he treated Wirfs ten times, appears not to have been reviewed.  In the letter of May 27, 2003, Dr. Martin makes it clear Wirfs would have trouble with work-related mental functions, including understanding, memory, sustained concentration, social interaction and adaptability.  In addition, Dr.  Martin's opinion of Wirfs' condition in 2001 is consistent with the lay testimony of her in-home care employers for late 2000, and her treating psychologist at the time, Dr.  Witt.  Tr.  247-

248, 334, 336.  The ALJ failed to provide sufficient reasons for rejecting the opinion of Wirfs'

treating psychiatrist, Dr. Martin.

### B.    Dr. Hale's opinion

Wirfs argues the ALJ improperly rejected the opinion of her treating psychologist, Dr.

Hale.  Dr. Hale began treating Wirfs in December 2002.  Tr. 275-277.  The treatment was

intermittent due to Wirfs' finances, but continued at least through 2006.  Tr. 558.  Dr. Hale

completed a form for Wirfs in June 2003,which noted marked functional limitations for mental

impairments that are part of the "B" criteria in the listing of impairments for mental illness.  20

C.F.R. Pt. 404, supt. P, app. 1, 12.00.  The ALJ stated,

> This doctor concluded in June 2003 that the claimant had a marked restriction of
> activities of daily living; marked difficulties in maintaining social functioning;
> marked difficulties in maintaining concentration, persistence and pace; and three or
> more episodes of decompensation. (Ex. 17F).
> However, this opinion was not convincing.  At the marked levels cited by Dr. Hale,
> the claimant would be expected to be institutionalized.  Not only has no
> institutionalization occurred, but the claimant testified that Dr. Hale had not
> changed her prescriptive medications, found her unable to take of herself or
> distrusted the claimant's ability to get along with other people.

Tr. 23.

The ALJ's reasons for rejecting Dr. Hale's opinion of 2003 regarding Wirfs' marked

limitations from December 2002, to March 2003, are not consistent with the regulations or the

record.  The regulations do not define "marked" as requiring institutionalization, but rather as

limitations that are more than moderate but less than extreme.[5]  C.F.R. Pt. 404, supt. P, app. 1,

---

[5]"A marked limitation may arise when several activities of functions are impaired, or
even when only one is impaired, as long as the degree of limitation is such to interfere seriously
with your ability to function independently, appropriately, effectively, and on a sustained basis."
20 C.F.R. Pt. 404, supt. P, app.1, 12.00(C).  Under *Activities of Daily Living*, the regulations
state, "We do not define "marked" by a specific number of different activities of daily living in
which functioning is impaired, but by the nature and overall degree of interference with function.

12.00(C).  There is no requirement regarding inability to care for oneself or to get along with other people.  *Id.*  In addition, the record is clear that Dr. Wirfs was never responsible for prescribing medications to Wirfs as medication management was performed by her psychiatrists and PMHNPs.  Tr.  254, 325, 437, 443-445, 466-467, 554.

The ALJ also discounts this opinion due to Dr.  Hale's notes of improvement in December 2003, February 2004, and January 2005.  Tr.  23.  However, Dr. Hale wrote a letter on July 25, 2003, stating the reasons for her ratings of marked limitations.  Tr.  323-324.  Dr. Hale specifically notes her ratings are based on her treatment of Wirfs from December 2002 through March 2003.  *Id.*  Although Dr.  Hale notes improvement by the end of this initial treatment period, it does not discount her opinion of Wirfs' limitations during the treatment period of December 2002, through March, 2003.  The ALJ did not properly evaluate Dr.  Hale's opinion of Wirfs' limitations during the treatment period.  As noted above, The ALJ cites parts of Dr.  Hale's treatment notes from late 2003, 2004, and January 2005, which note improvement.  Tr.  23.  However, Dr. Hale's notes and the notes of the PMHNPs prescribing Wirfs' medications indicate periods where symptoms were improved and periods where symptoms were increased.  Tr. 433, 435-437, 448, 452, 460, 465, 534-535.  Dr.  Hale's opinion is also supported by the improperly rejected opinion of Dr.  Martin, and the improperly rejected lay witness testimony regarding Wirfs' employability.

Wirfs submitted an undated letter from Dr.  Hale on August 8, 2006, to the Appeals Council.  Tr.  558.  The Appeals Council accepted the letter, and it is part of the record before the

---

For example, if you do a wide range of activities of daily living, we may still find that you have a marked limitation in your daily activities if you have serious difficulty performing them without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions.  20 C.F.R. Pt. 404, supt. P, app.1, 12.00(C)(1).

court. *Ramirez v. Shalala,* 8 F.3d 1449, 1452 (9th Cir. 1993). In the letter, Dr. Hale discusses

Wirfs' work limitations. Tr. 558. She notes Wirfs condition and symptoms "make it unlikely

that she could be gainfully employed in the foreseeable future." *Id.* Although the Commissioner

argues Wirfs made improvement, Dr. Hale's opinion, and the record as a whole, indicates the

improvement was not sustained. Dr. Hale is a treating psychologist with a long term relationship

with Wirfs. Dr. Hale's 2003 opinion was improperly rejected by the ALJ, and Dr. Hale's later

opinion notes Wirfs ongoing disability.

### C.    Lay Witness Testimony

Wirfs argues the ALJ failed to discuss lay witness testimony related to her short

employment in late 2000. "[F]riends, family members, and others in a position to observe a

claimant's symptoms and daily activities are competent to testify as to her condition." *Dodrill v.

Shalala*, 12 F.3d 915, 918-919 (9th Cir. 1993). Such testimony cannot be disregarded without

comment. *Nguyen v. Chater*, 100 F. 3d 1462, 1467 (9th Cir. 1996). "If the ALJ wishes to discount

lay witness testimony, he must give reasons that are germane to the witness." *Dodrill v. Shalala*,

12 F. 3d at 919.

The Commissioner concedes the ALJ failed to discuss the lay testimony of Mrs. Schilling

and Caleb Schilling, but argues the error is harmless. Mrs. Schilling noted in her letter that Wirfs

could not complete simple jobs like washing dishes and could not stay on task. Tr. 334. She

noted Wirfs would forget what she was doing and go home. *Id.* Ms. Schilling noted, "I've

noticed sometimes she has comprehension and conversational problems," and she can "no longer

do her work or other functions in life that she once did." *Id.*

Caleb Schilling provided written testimony regarding this employment.  Tr.  336.  He stated, "[d]uring the time she was employed by the state to be my mother's care provider, I observed first-hand a number of problems she was having with the job."  *Id.*  Schilling noted it was extremely difficult to keep her focused enough to complete a simple job .  He stated she would not attend to a given task, but would find other things and work on them, "never really finishing anything, just floating from one job to the next."  *Id.*  Schilling also noted, "[s]he seems to have a lot of difficulty keeping her thoughts straight.  She often times can't think of the right word or words to convey what she's thinking. . . . I can see where this would get in the way of a normal work environment, since communication is a necessary part of all levels of employment."  *Id.*

The failure to discuss the letters of Mrs. Schilling and Caleb Schilling is not harmless error.  "[A] reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination."  *Stout v. Commissioner, Social Sec. Admin.*, 454 F.3d 1050, 1056 (9th Cir. 2006).  Wirfs alleges disability from  September 2000.  The Schillings hired Wirfs to provide in-home care services for Mrs. Schilling for two months in late 2000.  The letters specifically address Wirfs' failure to perform the functions of the job, even with supervision.

Wirfs' inability to even complete a simple job, such as washing the dishes; her inability to stay on the job at times without leaving; and her difficulties in communicating with Mrs. Schilling, whom she knew for six years, indicate severe employment difficulties.  The court disagrees with the Commissioner that these limitations are adequately accounted for in the RFC. On the contrary, the letters address the very issue at hand, whether Wirfs' limitations at any time

from September 2000, were severe enough to interfere with her ability to work.  In addition, the

lay witness testimony regarding Wirfs' limitations support the improperly rejected opinions of

Wirfs' treating psychiatrist, Dr.  Martin, and treating psychologist, Dr.  Hale.

### D        Credibility Determination

Wirfs asserts the ALJ failed to give clear and convincing reasons for rejecting her

testimony.  The ALJ must assess the credibility of the claimant regarding the severity of

symptoms when the claimant produces objective medical evidence of an impairment that "could

reasonably be expected" to produce the alleged symptoms.  *Smolen v. Chater*, 80 F.3d 1273, 1281

(9th Cir. 1996)(citations omitted).  Wirfs has a medically determinable impairment which could

produce her alleged symptoms.  When there is an underlying impairment and no evidence of

malingering, an ALJ may discredit a claimant's testimony regarding the severity of symptoms

only by providing clear and convincing reasons based on specific findings.  *Dodrill v. Shalala*, 12

F.3d 915 at 918.

In assessing credibility, the ALJ may consider objective medical evidence, the claimant's

treatment history, and ordinary techniques of credibility evaluation.  *Smolen v. Chater*, 80 F.3d at

1284.  The ALJ cites Wirfs' testimony from her first hearing in 2003 regarding her memory

problems, spending problems, focus problems, hair pulling and social anxiety.  Tr.  25-26.  The

ALJ found Wirfs' testimony unconvincing because it was unsupported by medical opinions,

which indicated improvement in her condition.  Tr.  27.  The ALJ cites the 2001 opinion of state

agency examiner, Dr. Wahl, that Wirfs "had normal speech, although she seemed constrained by

difficulty in putting her thoughts into words.  Although her intermediate memory was impaired,

she had intact remote and intermediate memory."  Tr.  26.

The ALJ also cites a clinical note from January 2002, by Dr. McDonald, a psychiatrist who began seeing Wirfs in January 2002. Dr. McDonald's note indicates Wirfs was quite stable and her memory and cognition intact. Tr. 26. However, Dr. McDonald's notes from February through November, 2002, indicate a rapid change in symptoms, including an episode of hypomania, recurrent symptoms of PTSD, anxious affect, normal speech, recurrent nightmares, improved sleep, disorganized speech without delusions, persistent anxiety state, inattention, recurrent tearfulness, eyelash pulling, binge eating, sad affect, memory problems, shaking, rapid speech, mildly anxious affect, irritability, judgment lapses, spending to excess, and labile affect. Tr. 257-258, 261-267. Dr. McDonald also changed Wirfs' medications during this period. Tr. 261, 263, 266. The ALJ must consider the clinical notes in context. "That a person who suffers from severe panic attacks, anxiety, and depression makes some improvements does not mean that the person's impairments no longer seriously affect her ability to function in the workplace." *Holohan v. Massanari*, 246 R.3d 1195, 1205, (9th Cir. 2001). The ALJ should not search the record to find an inconsistency and ignore competent evidence that suggests the opposite conclusion. *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984).

The ALJ also cites a clinical note 2004 and 2005, by PMHNP Williams, Wirfs' psychiatric medication manager. Tr. 26. These two clinical notes cited by the ALJ indicate Wirfs had stable moods, linear though processes, and intact judgment. *Id.* However, PMHNP Williams also increased and added medications during this time due to PTSD flashbacks which increased Wirfs' anxiety, hair pulling, nightmares, and intrusive thoughts. Tr. 443-444, 448. In addition, the ALJ cites these clinical notes to discount Wirfs' 2003 testimony, however, these notes are from a

period after the 2003 hearing testimony.  Although Wirfs did testify briefly at the 2005 hearing, the ALJ does not reference this testimony until later in her opinion.  Tr.  26-27.

The ALJ stated Wirfs' 2005 testimony indicated that her "bipolar disorder was '. . . doing pretty well.'"  Tr.  27.  The ALJ also noted Wirfs stated that Dr. Hale had not changed any of her medications.  *Id.*  As noted above, Dr.  Hale never prescribed or managed Wirfs medications, this was done by her psychiatrists of PMHNPs.

Medical evidence alone is not sufficient to undermine a claimant's credibility.  *Burch v. Barnhart*, 400 f.3d 676, 680 (9th Cir. 2005), *Thomas v. Barnhart,* 278 F.3d at 960.  The ALJ may also consider the claimant's daily activities, work record, and the observations of physicians and third parties with personal knowledge about the claimant's functional limitations.  *Id.* at 958-959 (citations omitted).  The ALJ found it significant that Wirfs testified she did not have a history of being unable to take care of herself; and that she "could be trusted to get along with other people." Tr.  27.  Wirfs responded to questions from the ALJ at the 2003 hearing regarding Dr.  Hale:

> Q:    Does she feel that you need to have someone take care of you all the time?
> A:    No.
> Q:    Does she feel that you can't be trusted to get along with anybody?  That you just have total inability to get along with you family or friends?
> A:    No, I don't think she feels that way.

Tr.  572.

The ALJ also found Wirfs ability to complete some activities of daily living, such as cooking, using a checkbook, and occasionally driving and shopping by herself undermined her credibility regarding her anxiety about performing these tasks.  The ability to perform daily household chores may indicate an ability to work.  *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995).  However, a disability claimant does not need to be "utterly incapacitated to be eligible for

benefits." *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989).  Wirfs ability to occasionally

complete some tasks with increased anxiety does not necessarily transfer to a work environment.

Many daily activities conducted at home are not be easily transferable to a work environment,

where it might not be possible to rest periodically, or take medication.  *Id.*  The ALJ has not

provided sufficient reasons for rejecting Wirfs' testimony.

**IV.    Remand**

The decision whether to remand for further proceedings or for immediate payment of

benefits is within the discretion of the court.  *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir.

2000), *certiorari denied*, 531 U.S. 1038 (2000).  The issue turns on the utility of further

proceedings.  A remand for an award of benefits is appropriate when "no useful purpose would be

served by further administrative proceedings or when the record has been fully developed and

there is not sufficient evidence to support the ALJ's conclusion.  *Rodriguez v. Bowen,* 876 F.2d

759, 763 (9th Cir 1989) (citations omitted).

Improperly rejected evidence should be credited and an immediate award of benefits

directed where

> (1) the ALJ has failed to provide legally sufficient reasons for
> rejecting such evidence, (2) there are no outstanding issues that
> must be resolved before a determination of disability can be made,
> and    (3) it is clear from the record that the ALJ would be required
> to find the claimant disabled were such evidence credited.

*Harman v. Apfel*, 211 F.3d at 1178, (citations omitted).  The third prong of this test is actually a

subpart of the second.  *Id.* at 1178 n 7.

In this case, the ALJ improperly rejected the opinions of Wirfs' treating psychiatrist and

psychologist, and the testimony of the lay witnesses and Wirfs .  The Appeals Council accepted a

letter from Dr. Hale, the treating psychologist, which indicated ongoing disability. The

improperly rejected evidence and the most recent opinion evidence require a finding of disability.

## **CONCLUSION**

Based on the foregoing, the Commissioner's decision that Wirfs was not disabled at any

time from her alleged onset date is not based on correct legal standards and not supported by

substantial evidence. The case is remanded for an immediate award of benefits.

## **ORDER**

The Commissioner's final decision is REVERSED AND REMANDED for an award of

benefits.

IT IS SO ORDERED.

DATED this _____5th_____ day of May, 2008.


  /s/ Garr M. King_____
Garr M. King
United States District Judge